**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**THREE DURANS, LLC,**

          **Plaintiff,**

    **v.**                                                    **No.**   2:20-cv-1881

**COUNTY OF ALLEGHENY, a political
subdivision of the Commonwealth of
Pennsylvania, the ALLEGHENY
COUNTY HEALTH DEPARTMENT,
THE PENNSYLVANIA LIQUOR
BOARD and the BOROUGH OF
CARNEGIE POLICE DEPARTMENT,**

          **Defendants.**

## **COMPLAINT**

AND NOW, the Plaintiff, Three Durans, LLC, by and through its attorneys,
Robert O Lampl, James R. Cooney, Ryan J. Cooney, Sy O. Lampl and
Alexander L. Holmquist, files the within Complaint:

    1.      The Plaintiff is Three Durans, LLC (Three Durans), a Pennsylvania
Limited Liability Company located at 701 W. Main Street, Carnegie, PA 15106-
2565.

    2.      The Defendant, County of Allegheny (the County), is a home rule
county and political subdivision of the Commonwealth of Pennsylvania with
offices at Allegheny County Department of Law, 300 Fort Pitt Commons, 445 Fort
Pitt Blvd., Pittsburgh, PA 15219.

    3.      The Defendant, Allegheny County Health Department (the ACHD),
is a local health department organized under the Local Health Administration Law

1

with offices at Allegheny County Health Department, 301 39th Street, Bldg. #7, Pittsburgh, PA 15201.

4.      The Defendant, the Pennsylvania Liquor Control Board (the LCB), is a Commonwealth Agency with offices at Office of Chief Counsel, 401 Northwest Office Building, Harrisburg, PA 17124-0001.

5.      The Defendant, Borough of Carnegie Police Department (Carnegie Police), is a Local Agency with offices at 1 Veteran's Way, Carnegie, PA 15106.

**Jurisdiction and Venue:**

6.      This Honorable Court has jurisdiction over this proceeding pursuant to *28 U.S.C. Section 1331.*

7.      Venue of this action is appropriate in the Western District of Pennsylvania pursuant to *28 U.S.C. Sections 1391 (b) (1) and 1391 (b) (2).*

**Background:**

8.      Three Duran's operates a restaurant and bar in Carnegie, PA known as Hottie's Martini & Cigar Bar (Hottie's).

9.      Hottie's has been open for business since March of 2019.

10.     In March of 2019, the ACHD issued a permit to Hottie's for its operation as a restaurant.  In addition, the LCB issued a liquor license (License No. R5335) to Hottie's for operation as a bar and tavern.

**The "disaster" declarations:**

11.     On March 6, 2020, Pennsylvania Governor Tom Wolf issued a Proclamation of Disaster Emergency in response to the COVID-19 pandemic. A true and correct copy of the Proclamation is attached hereto as Exhibit "A."[1]

12.     The Governor's Proclamation was issued pursuant to the Emergency Management Services Code, *35 Pa.C.S. 7101 et seq.*

13.     The Governor's emergency powers under the Code are set forth in *35 Pa.C.S. 7301 (c),* which provides in relevant part, that:

> **(c) *Declaration of disaster emergency.* —** A disaster emergency shall be declared by executive order or pro-clamation of the Governor upon finding that a disaster has occurred or that the occurrence or the threat of a disaster is imminent. The state of disaster emergency shall continue until the Governor finds that the threat or danger has passed or the disaster has been dealt with to the extent that emergency conditions no longer exist and terminates the state of disaster emergency by exec-utive order or proclamation, but no state of disaster emer-gency may continue for longer than 90 days unless re-newed by the Governor.

14.     In connection with the Governor's Proclamation, on July 1, 2020, the Secretary of the Pennsylvania Department of Health issued an Order "requiring universal face coverings." A true and correct copy of the Order is attached hereto as Exhibit "E."

15.     In issuing her Order (Exhibit "E"), the Secretary failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.),* the Regulatory Review Act (*71 P.S. 745.1 et seq.)* and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.).*

---

[1] The Governor has extended the Disaster Proclamation three times. The Proclamation was first extended on June 3, 2020, extended for a second time on August 31, 2020 and extended for a third time on November 24, 2020. See Exhibits "B," "C" and "D" hereto.

16.     On July 16, 2020, Governor Wolf issued an Order "Directing Targeted Mitigation Measures."  A true and correct copy of the Order is attached hereto as Exhibit "F."

17.     Pursuant to the "Targeted Mitigation Measures," (Exhibit "F"), among other things, restaurants were limited to the lesser of:

    A.     25% of fire code stated maximum occupancy for indoor dining; or

    B.     25 persons including staff.

18.     In issuing his Order (Exhibit "F"), the Governor failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.),* the Regulatory Review Act (*71 P.S. 745.1 et seq.)* and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.).*

**The "shutdowns" by the Carnegie Police:**

19.     Beginning in September of 2020, representatives of the Carnegie Police have ordered Hottie's to be "shut down" on multiple occasions, as the result of alleged "covid violations."

20.     The Carnegie Police have never charged the Three Durans with a crime, and none of the "shutdowns" were the result of any criminal activity.

21.     Rather, the Carnegie Police have justified their actions on the basis of the "Universal Face Coverings" order issued by the Secretary of Health and the Targeted Mitigation Order issued by the Governor.

22.     Representatives of the Three Durans met with Jeff Kennedy, the Police Chief of the Borough of Carnegie.

4

23.     Chief Kennedy threatened to permanently close down Hottie's, and to raid Hottie's every day until it was closed down.

24.     Chief Kennedy advised the Three Durans that he had reported Hottie's to the ACHD and the LCB.

**The Closure Orders issued by the ACHD:**

25.     On September 19, 2020, the ACHD conducted an inspection of Hottie's. A true and correct copy of the Food Safety Assessment Report is attached hereto as Exhibit "G."

26.     As a result of the inspection, the ACHD ordered Hottie's to be closed for a period of 7 days. However, as indicated by the Report, the closure had nothing to do with food safety, but rather, was based solely upon the "Universal Face Coverings" order issued by the Secretary of Health, and the Targeted Mitigation Order issued by the Governor.

27.     The ACHD determined that Hottie's presented an "imminent hazard," due to:

A.     No mask usage.

B.     Overcrowding around the bar.

C.     Serving of alcohol beyond the 11:00 closure order.

28.     The Carnegie Police and the LCB participated in the initial inspection by the ACHD.

29.     The ACHD conducted a re-inspection of the premises on October 2, 2020.

30.     Following the re-inspection, the ACHD "removed" the closure Order.

31.     On October 16, 2020, the ACHD again conducted an inspection of Hottie's. A true and correct copy of the Food Safety Assessment Report is attached hereto as Exhibit "H."

32.     Following its inspection, the ACHD again ordered Hottie's to be closed for a period of 7 days. However, as indicated by the Report, the closure had nothing to do with food safety, but rather, was based solely upon the "Universal Face Coverings" order issued by the Secretary of Health and the Targeted Mitigation Order issued by the Governor.

33.     The ACHD determined that Hottie's presented an "imminent hazard," due to:

A.      No mask usage.

B.      Serving of alcohol without a meal.

34.     The ACHD conducted a third re-inspection on October 23, 2020, and again ordered Hottie's to be closed "for at least 7 days." A true and correct copy of the Food Safety Assessment Report is attached hereto as Exhibit "I."

35.     Similar to the prior closure orders, this closure had nothing whatsoever to do with food safety. Instead, it was based solely upon the "covid mitigation orders" issued by the Secretary of Health and the Governor.

**Suspension/closure by the LCB:**

6

36.     As set forth above, the LCB participated in the initial inspection by the ACHD.

37.     Following the inspection, representatives of the Three Durans met with Santo M. Bonadio of the LCB.

38.     Mr. Bonadio is of Caucasian descent.

39.     When Mr. Bonadio referred to Hottie's clientele, which is racially mixed, he referred to "them people," and intimated that the "shutdown" was racially motivated, based upon Hottie's African American customers. Mr. Bonadio also referenced statements by the Carnegie Police regarding "them people." In addition, Mr Bonadio threatened to have Hottie's declared to be a nuisance bar.

40.     On October 26, 2020, the LCB sent a Notice of Suspension to the Three Durans. A true and correct copy of the Notice is attached hereto as Exhibit "J."

41.     As indicated, the LCB suspended the Three Durans' liquor license for the period of October 26, 2020 until November 10, 2020.

42.     The suspension was not predicated upon any liquor code violations. Rather, the sole reason was the "failure to comply with the Governor's targeted mitigation measures."

43.     The LCB failed to provide the Three Durans with notice or a hearing prior to the suspension.

44.     On November 24, 2020, representatives of the Three Durans attended a meeting with the LCB at its offices on Mt. Nebo Road.

45.     At the meeting, the LCB advised the Three Durans that if it did not comply with the Covid mitigation orders, the LCB would revoke the liquor license and pursue criminal charges.

**Damages to the Three Durans:**

46.     The combined actions of the Carnegie Police, the ACHD and the LCB have caused significant financial damages to the Three Durans.

47.     The constant closures and license suspensions have severely impacted the Three Duran's income and operations, and have threatened its ability to remain solvent and pay its bills.

**The within case:**

48.     The Three Durans now files the within case for violation of its civil rights pursuant to *42 U.S.C. 1983.*

49.     The Carnegie Police, the ACHD and the LCB were clearly acting under color of state law for purposes of *42 U.S.C. 1983.*

50.     The Defendants have violated the Three Durans' civil rights while acting under color of state law as is more fully set forth below. Among other things:

A.      The "Covid mitigation orders" which the Carnegie Police, the ACHD and the LCB have attempted to enforce have no valid basis in law.

B.      The Secretary of Health failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.),* the Regulatory Review Act (*71 P.S. 745.1 et seq.)* and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.).*

8

C.      The Governor failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.),* the Regulatory Review Act (*71 P.S. 745.1 et seq.)* and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.).*

D.      The Universal Face Covering Order was issued pursuant to the Governor's Emergency Declaration under *35 Pa.C.S. 7301 (c).* However, the Governor has illegally extended "the emergency" contrary to both federal and state law.

E.      The Secretary of Health's Order "requiring universal face coverings" was issued in violation of the separation of powers doctrine.

F.      The Governor's Order "Directing Targeted Mitigation Measures" was issued in violation of the separation of powers doctrine.

G.      There is no rational or scientific basis for the Order requiring universal face coverings.[2]

H.      There is no rational or scientific basis for the Order "Directing Targeted Mitigation Measures."

I.      The Defendants' actions have deprived the Three Durans of due process of law, both procedurally and substantively.

J.      The closure orders will deprive the owners of the Three Durans of their right to make a living.

K.      The Defendants' actions have deprived the Three Durans of equal protection under the law.

---

[2] Scientific evidence on the efficacy of face masks is conflicting. For example, Cyril H. Wecht, M.D., J.D., the former Coroner of Allegheny County, has stated that the mandatory mask order is "totally absurd."

## COUNT 1:

### The Orders are not enforceable:

51.     The Plaintiff hereby incorporates paragraphs 1 through 50 above as if set forth in their entirety.

52.     On July 1, 2020, the Secretary of the Pennsylvania Department of Health issued an Order "requiring universal face coverings." (See Exhibit "E" hereto).

53.     In issuing her Order, the Secretary failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.),* the Regulatory Review Act (*71 P.S. 745.1 et seq.)* and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.).*

54.     On July 16, 2020, Governor Wolf issued an Order "Directing Targeted Mitigation Measures."  (See Exhibit "F" hereto).

55.     In issuing his Order, the Governor failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.),* the Regulatory Review Act (*71 P.S. 745.1 et seq.)* and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.).*

56.     The law is clear that:

The Commonwealth Documents Law, the Regulatory Review Act, and the Commonwealth Attorneys Act establish a manda-tory, formal rulemaking procedure that is, with rare exceptions, required for the promulgation of all regulations. *See Germantown Cab Co. v. Philadelphia Parking Auth.*, 993 A.2d 933, 937 (Pa. Cmwlth. 2010), *aff'd*, 614 Pa. 133, 36 A.3d 105 (2012). Under the Commonwealth Documents Law, an agency must give notice to the public of its proposed rulemaking and an opportunity for the public to comment. Section 201 of the Commonwealth Documents Law, 45 P.S. § 1201; *Borough of Bedford v. Dept. of Envtl. Prot.*,

> 972 A.2d 53 (Pa. Cmwlth. 2009). Under the Regulatory Review Act,
> the agency must also submit its proposed regulation to IRRC for
> public comment, recommendation from IRRC, and, ultimately,
> IRRC's approval or denial of a final-form regulation. Section 5 of
> the Regulatory Review Act, *as amended*, 71 P.S. § 745.5. The
> Commonwealth Attorneys Act requires the agency to submit all
> proposed regulations to the Attorney General and Governor's
> Office of General Counsel for review of the form and legality.
> 71 P.S. §§ 732-204(b), -301(10).

*Naylor v. Commonwealth*, 2012 Pa. Commw. LEXIS 285, 54 A.3d 429, 433-434

(2012). See also, *Northwestern Youth Services v. Dep't of Public Welfare,* 620

Pa. 140, 66 A.3d 301 (2013).

57.     In enacting the Orders at issue in the present case, both the

Governor and the Secretary of Health wholly failed to comply with these

requirements.

58.     Such failure clearly causes the Orders to be unenforceable as a

matter of law. See, *Germantown Cab Co. v. Philadelphia Parking Authority,* 614

Pa. 133, 36 A.3d 105 (2012) and cases cited therein.

## COUNT 2:

## The Defendants (and the Governor)

## have improperly extended the "emergency powers":

59.     The Plaintiff hereby incorporates paragraphs 1 through 58 above as

if set forth in their entirety.

60.     On March 6, 2020, Pennsylvania Governor Tom Wolf issued his

first Proclamation of Disaster Emergency (See Exhibit "A").

61.     Pursuant to *35 Pa.C.S. 7301 (c),* the Governor's emergency powers under the Emergency Management Services Code only last for 90 days unless the disaster emergency is "renewed" by the Governor.

62.     On April 13, 2020, the Supreme Court of Pennsylvania issued its opinion in the case *Friends of Devito v. Wolf,* 2020 Pa. LEXIS 1987, 227 A.3d 872 (2020). In *Devito,* the plaintiffs filed a Petition for King's Bench Jurisdiction asserting that the Governor lacked the authority to order the closure of "non-life-sustaining businesses." The Pennsylvania Supreme Court held that the Governor's Order was within his emergency powers since the closure was "temporary. " As stated by the Court:

> We consider the appropriateness of the due process afforded in light of the fact that the ***loss of Petitioner's property rights are temporary and find this significant***. The temporary deprivation impact effects each of the  factors in the *Mathews* balancing test. While the private interest, the closure of the business, is important, the risk of erroneous temporary deprivation does not outweigh the value of additional or substitute safeguards which could not be provided within a realistic timeframe.

(emphasis added).

63.     On June 3, 2020, the Governor extended the Disaster Proclamation for the first time. See Exhibit "B" hereto.

64.     On August 24, 2020, Governor Wolf sent a letter to the Members of the Senate of Pennsylvania. In his letter, the Governor advised the Senate that:

> In July, I extended that initial Order through August 31st.
> Unfortunately, given my authority under the Emergency Services Management Code, an executive order further extending protections from foreclosure and eviction is not a viable option. Any further relief must be a product of the Legislature.

A true and correct copy of the Governor's August 24, 2020 letter to the Senate is attached hereto as Exhibit "K."

65.     Despite his letter to the Senate, on August 31, 2020, Governor Wolf extended the Emergency Declaration for a second time. See Exhibit "C" hereto. In addition, on November 24, 2020, Governor Wolf extended the Emergency Declaration for a third time. See Exhibit "D" hereto.

66.     The Three Durans believe that the second and third extensions constituted an abuse of the Governor's emergency powers. In fact, the Governor's letter (Exhibit "K") is an admission that he lacked the power to issue a further extension.

67.     In *County of Butler v. Wolf,* 2020 U.S. Dist. LEXIS 167544 (W.D. Pa. 2020), the Honorable William S. Stickman, IV held that the second extension constituted an abuse of power by the Governor.  As stated by Judge Stickman:

> It is true that under 35 Pa.C.S.A § 7301(c), the Governor's declaration of emergency, and related measures, will expire after ninety days. However, the Governor is able to *sua sponte* issue a continued emergency declaration. In *Wolf v. Scarnati,* __A.3d__, 2020 Pa. LEXIS 3603, 2020 WL 3567269 (Pa. Jul. 1, 2020), the Pennsylvania Supreme Court held that a vote of the legislature was powerless to vitiate the declaration, unless the governor signed off (as in normal legislation). *See* 2020 Pa. LEXIS 3603, ("because H.R. 836 was not presented to the Governor, and, in fact, affirmatively denied the Governor the opportunity to approve or veto that resolution, H.R. 836 did not conform with the General Assembly's statutory mandate in section 7301(c) or with the Pennsylvania Constitution.").
>
> Thus, in practical effect, absent a veto-override, the Governor's orders can be reissued without limit. Professors Wiley & Vladeck recognized that this situation could lead to the situation of the permanent emergency: "[a]t least under federal law, emergencies, once declared, tend not to end; the President can unilaterally extend national emergency declarations on an annual basis in per-

petuity, and can be stopped only by veto-proof supermajorities of both houses of Congress. And unless courts are going to rigorously review whether the factual justification for the emergency measure is still present[,] . . . the government can adopt measures that wouldn't be possible during "normal" times long after the true exigency passed." Wiley & Vladeck, *supra page 16, at 187.* On August 31, 2020, the Governor renewed the emergency declaration, extending his extraordinary authority for an additional ninety days. (ECF No. 73-1). Again, absent an extraordinary veto-proof vote of the General Assembly, there is no limit on the number of times the Governor may renew the declaration and vest himself with extraordinary unilateral powers.

68.     In his Dissenting Opinion in the case of *Calvary Chapel Dayton Valley v. Sisolak*, 2020 U.S. LEXIS 3584 (July 24, 2020), the Honorable Justice Samuel Alito agreed with Judge Stickman as follows:

A public health emergency does not give Governors and other public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists. As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights.

69.     These principles clearly apply in the present case.

## COUNT 3:

## The Orders violate the

## separation of powers doctrine:

70.     The Plaintiff hereby incorporates paragraphs 1 through 69 above as if set forth in their entirety.

71.     As set forth above, both the Secretary of Health and the Governor failed to comply with the mandatory rule making procedure required under the Commonwealth Documents Law (*45 P.S. 1102 et seq.),* the Regulatory Review

14

Act (*71 P.S. 745.1 et seq.)* and the Commonwealth Attorneys Act (*71 P.S. 732-101 et seq.).*

72.     Accordingly, the Orders are nothing more than an attempt to control the citizens of the Commonwealth of Pennsylvania by executive fiat.

73.     As such, the Orders violate the doctrine of separation of powers.

74.     The law is clear that:

The doctrine of separation of powers is concerned with the allocation of official power among the three co-equal branches of our Government. The Framers "built into the tripartite Federal Government . . . a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley* v. *Valeo*, 424 U.S. at 122. Thus, for example, the Congress may not exercise the judicial power to revise final judgments, *Plaut* v. *Spendthrift Farm, Inc.,* 514 U.S. 211, 131 L. Ed. 2d 328, 115 S. Ct. 1447 (1995), or the executive power to manage an airport, see *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 276, 115 L. Ed. 2d 236, 111 S. Ct. 2298 (1991) (holding that "if the power is executive, the Constitution does not permit an agent of Congress to exercise it"). See *J. W. Hampton, Jr., & Co.* v. *United States,* 276 U.S. 394, 406, 72 L. Ed. 624, 48 S. Ct. 348 (1928) (Congress may not "invest itself or its members with either executive power or judicial power"). Similarly, the President may not exercise the legislative power to authorize the seizure of private property for public use. *Youngstown,* 343 U.S. at 588. And, the judicial power to decide cases and controversies does not include the provision of purely advisory opinions to the Executive, or permit the federal courts to resolve nonjusticiable questions.

*Clinton v. Jones,* 520 U.S. 681, 699-700, 117 S. Ct. 1636, 1647, 137 L. Ed. 2d 945, 964 (1997).

75.     The case of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L. Ed. 1153 (1952) is directly on point. In *Youngstown,* the Supreme Court of the United States held that the president, as part of the

executive branch, lacked the power to enact legislative rules. As stated by the

Court:

> Nor can the seizure order be sustained because of the several
> constitutional provisions that grant executive power to the Pres-
> ident.  In the framework of our Constitution, the President's power
> to see that the laws are faithfully executed refutes the idea that he
> is to be a lawmaker. The Constitution limits his functions in the
> lawmaking process to the recommending of laws he thinks wise
> and the vetoing of laws he thinks bad. And the Constitution is nei-
> ther silent nor equivocal about who shall make laws which the Pres-
> ident is to execute. The first section of the first article says that "All
> legislative Powers herein granted shall be vested in a Congress of
> the United States . . . ." After granting many powers to the Congress,
> Article I goes on to provide that Congress may "make all Laws which
> shall be necessary and proper for carrying into Execution the fore-
> going Powers, and all other Powers vested by this Constitution in the
> Government of the United States, or in any Department or Officer
> thereof."

This same analysis clearly applies to state governments.

76.    In *County of Butler v. Wolf,* 2020 U.S. Dist. LEXIS 167544 (W.D.

Pa. 2020), the Honorable William S. Stickman, IV made the following observation

that is relevant to the separation of powers issue:

> There is no question that our founders abhorred the concept of
> one-person rule. They decried government by fiat. Absent a ro-
> bust system of checks and balances, the guarantees of liberty
> set forth in the Constitution are just ink on parchment. There is
> no question that a global pandemic poses serious challenges for
> governments and for all Americans. But the response to a pan-
> demic (or any emergency) cannot be permitted to undermine
> our system of constitutional liberties or the system of checks
> and balances protecting those liberties. Here, Defendants are
> statutorily permitted to act with little, if any, meaningful input
> from the legislature. For the judiciary to apply an overly defer-
> ential standard would remove the only meaningful check on
> the exercise of power.

77.    In fact, the Pennsylvania Legislature has attempted to limit or

terminate Governor Wolf's exercise of the emergency powers.

78.     On June 9, 2020, the Pennsylvania Senate and the Pennsylvania House of Representatives adopted a concurrent resolution that ordered Governor Wolf to terminate the disaster emergency.

79.     Governor Wolf vetoed the resolution, and on June 11, 2020, Joseph B. Scarnati, III, the President Pro Tempore of the Senate, filed a Complaint in Mandamus to enforce the resolution.

80.     In response, Governor Wolf filed a Petition for King's Bench Jurisdiction to the Supreme Court of Pennsylvania.

81.     In its Opinion, entered on July 1, 2020, the Supreme Court held that the Legislature could only override the Governor's veto by a two-thirds majority vote. See *Wolf v. Scarnati,* 2020 Pa. LEXIS 3603 (July 1, 2020). In response to Scarnati's argument that the governor's veto violated the separation of powers doctrine, the Majority declined to address the constitutional issue.

82.     Justice Saylor, joined by Justice Mundy, authored a Dissenting Opinion based upon the separation of powers doctrine. As set forth in the Dissent:

> I simply cannot envision that the framers of the Pennsylvania Constitution contemplated that the Governor could be invested with a panoply of exceptional powers - including the delegated power to suspend laws and commandeer private property - but that the Legislature nonetheless would be powerless to implement a counterbalance that was not then subject to the chief executive's own veto power.

## COUNT 4:

## The Plaintiff was

## deprived of procedural due process:

83.     The Plaintiff hereby incorporates paragraphs 1 through 82 above as if set forth in their entirety.

84.     The ACHD suspended the Three Durans' health permit without prior notice and the opportunity to be heard.

85.     Similarly, the LCB suspended the Three Durans' liquor license without prior notice and the opportunity to be heard.

86.     Notice and the opportunity to be heard are the touchstones of due process of law. See, *Armstrong v. Manzo,* 380 U.S. 545, 85 S. Ct. 1187, 14 L.Ed. 2d 62 (1965):

> A fundamental requirement of due process is "the opportunity to be heard." *Grannis* v. *Ordean*, 234 U.S. 385, 394. It is an opportunity which must be granted at a meaningful time and in a meaningful manner.

See also, *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S. Ct. 1983, 1994, 32 L. Ed. 2d 556 (1971); *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S. Ct. 780, 786, 28 L. Ed. 2d 113 (1971).

87.     The law is clear that citizens are entitled to due process even in times of emergency or crisis. See, *Friends of Devito v. Wolf,* 2020 Pa. LEXIS 1987, 227 A.3d 872 (2020):

> We cannot agree, however, with Respondents' contention that Petitioners were not entitled to any procedural due process, either before or after the entry of the Executive Order. Respondents' Brief at 35 ("Viewing the present public health emergency through a *Mathews* lens, it is apparent what balance is to be struck. — No additional safeguards are feasible, and the countervailing public interest is beyond debate."). The Supreme Court has held that at all times, even when the country is at war, essential liberties remain in effect. *Bell v. Burson*,

402 U.S. 535, 542, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971).

88.     The Defendants' violations of the Three Durans' rights to due process of law are clearly actionable under *42 U.S.C. 1983*. See, *Lewis v. N.M. Dep't of Health*, 261 F.3d 970 (10th Cir. 2001) and cases cited therein.

**COUNT 5:**

**The Plaintiff was deprived of substantive**

**due process: The Owners' right to earn a living**

89.     The Plaintiff hereby incorporates paragraphs 1 through 88 above as if set forth in their entirety.

90.     On July 16, 2020, Governor Wolf issued an Order "Directing Targeted Mitigation Measures."  A true and correct copy of the Order is attached hereto as Exhibit "F."

91.     Pursuant to the Targeted Mitigation Measures Order, among other things, restaurants were limited to the lesser of:

A.     25% of fire code stated maximum occupancy for indoor dining; or

B.     25 persons including staff.

92.     As a result of the "Targeted Mitigation Measures," the Three Durans' suffered a severe loss of business and income.

93.     According to The Pittsburgh Business Times, the Covid shutdown has caused more than 130 restaurants to go out of business permanently.

94.     The owners of the Three Durans depend upon the income from Hottie's to pay their living expenses.  In fact, the income loss suffered as the result of the Targeted Mitigation Measures Order has made it difficult for the Three Durans to pay its bills.

95.     In addition, as set forth above, the Carnegie Police, the ACHD and the LCB have shut down Hottie's on numerous occasions.

96.     The shutdown orders were imposed without due process of law.

97.     Accordingly, such orders violate the Three Durans' substantive due process rights.

98.     In *County of Butler v. Wolf*, 2020 U.S. Dist. LEXIS 167544 (W.D. Pa. 2020), the Honorable William S. Stickman, IV held that:

> A total shutdown of a business with no end-date and with the specter of additional, future shutdowns can cause critical damage to a business's ability to survive, to an employee's ability to support him/herself, and adds a government-induced cloud of uncertainty to the usual unpredictability of nature and life.

99.     The same principle clearly applies in the present case.

## COUNT 6:

### The Plaintiff has been

### deprived of equal protection under the law:

100.    The Plaintiff hereby incorporates paragraphs 1 through 99 above as if set forth in their entirety.

101.    The Defendants have strictly limited the Three Durans' occupancy limits, while at the same time, they have condoned and participated in large gatherings, including public protests and political gatherings.

20

102.    These actions clearly violate the Three Durans' right to equal

protection under the law.

103.    In *County of Butler v. Wolf*, 2020 U.S. Dist. LEXIS 167544 (W.D.

Pa. 2020), Judge Stickman made the following observations which are relevant

to the equal protection issue:

> While permitting commercial gatherings at a percentage
> of occupancy may not render the restrictions on other
> gatherings content-based, they do highlight the lack of
> narrow tailoring. *See Ramsek*, 2020 U.S. Dist. LEXIS
> 110668, ("retail stores, airports, churches and the like
> serve as an inconvenient example of how the Mass
> Gatherings Order fails at narrow tailoring."). Indeed,
> hundreds of people may congregate in stores, malls,
> large restaurants and other businesses based only on
> the occupancy limit of the building. Up to 20,000 people
> may attend the gathering in Carlisle (almost 100 times
> the approved outdoor limit!)—with Defendants' blessing.
>
> Ostensibly, the occupancy restriction limits in Defendants'
> orders for those commercial purposes operate to the same
> end as the congregate gathering limits to combat the spread
> of COVID-19. However, they do so in a manner that is far less
> restrictive of the First Amendment right of assembly than the
> orders permit for activities that are more traditionally covered
> within the ambit of the Amendment—political, social, cultural,
> educational and other expressive gatherings.

## COUNT 7:

### The Defendants conduct was motivated,

### at least in part, by improper racial animus:

104.    The Plaintiff hereby incorporates paragraphs 1 through 103 above

as if set forth in their entirety.

105.    Following the initial inspection by the LCB, representatives of the

Three Durans met with Santo M. Bonadio of the LCB.

106.    Mr. Bonadio is of Caucasian descent.

107.    When Mr. Bonadio referred to Hottie's clientele, which is racially mixed, he referred to "those people," and intimated that the "shutdowns" were racially motivated based upon Hottie's African American customers.

108.    Such conduct is clearly actionable under *42 U.S.C. 1983.*

## COUNT 8:

## Defendants have engaged

## in a conspiracy to violate Plaintiff's civil rights:

109.    The Plaintiff hereby incorporates paragraphs 1 through 108 above as if set forth in their entirety.

110.    During his meeting with the Three Durans, Chief Kennedy advised that he had reported the Three Durans to the Health Department and the LCB.

111.    Subsequent to the meeting, both the ACHD and LCB took action to shut down the operation of Hottie's.

112.    Based upon the same, the Plaintiff believes and therefore avers that the Defendants have engaged in a conspiracy to violate Plaintiff's civil rights.

113.    Such conduct is actionable under both *42 U.S.C. 1983* and *42 U.S.C. 1985.*

## COUNT 9:

## Plaintiff is entitled to

## recover attorneys' fees pursuant to *42 U.S.C. 1988:*

114.    The Plaintiff hereby incorporates paragraphs 1 through 108 above as if set forth in their entirety.

115.    *42 U.S.C. 1988* provides in relevant part that a plaintiff in a civil rights action may cover reasonable attorneys' fees as part of the costs.

116.    The Three Durans hereby request recovery of its reasonable attorneys' fees pursuant to *42 U.S.C. 1988.*

WHEREFORE, the Plaintiff respectfully requests this Honorable Court to enter judgment in favor of the Plaintiff and against the Defendants for the following relief: (1) a declaratory judgment finding that the "emergency orders" are unconstitutional, and that the Defendants have violated the Plaintiff's civil rights by attempting to enforce such orders ; (2) an injunction to prevent further violations; (3) damages; (4) attorneys' fees pursuant to *42 U.S.C 1988;* and (5) any other relief that is just and appropriate.

Respectfully Submitted,

   /s/ James R. Cooney
JAMES R. COONEY
PA I.D. #32706

ROBERT O LAMPL
PA I.D. #19809

RYAN J. COONEY
PA I.D. #319213

SY O. LAMPL
PA.I.D. #324741

ALEX L. HOLMQUIST
PA I.D. #314159

Benedum Trees Building
223 Fourth Avenue, 4th Floor
Pittsburgh, PA 15222
(412) 392-0330 (phone)
(412) 392-0335 (facsimile)

**Attorneys for the Plaintiff**